Good morning. If I said to you at 5 o'clock this afternoon I want all, everybody in this courtroom to come and have a martini with you, what would that mean? Other than a free drink. It would mean that you're using your credit card maybe more than you're using the cash in your pocket. No, no, no, no. Would it or would it not include everybody in the room? If I said all. All right, then tell me what's wrong here. I don't know what's wrong, if anything, Your Honor, with that hypothetical, but what you've got here, it's like going to the nursery or the garden center and looking at 80, 90, 100 yards of topsoil, mulch, or decorative rock and asking the owner, I'll take all of it for a sum of money. A couple days later he comes with one yard in the back of his small pickup truck. Big difference. That's what we've got. A huge shortfall here, Your Honor, not even close. And we've got some definition of all. We've got the defendant here, Mr. Anthony, admitting in his deposition that his inventory document was included in the contract, and we've got him admitting in an interrogatory. Where in the contract is it included? It's part of the contract, is what he said in his deposition. In interrogatory 11, he says that the contract involved millions of dollars of parts, so even if we take millions at its lowest possible number, that's $2 million and he's still wildly short. So that's where we've got the breach of contract. And we've got other big problems here with Judge Kyle's decision below, and that is we've got a big problem with the way contra properentum was applied. And we've got, if I might, Your Honor, in my own brief, at page 46, we've got an image of Section 4 of the Employment Agreement. Again, page what? 46. All right, thank you. And if we look at Section 4D, effect of termination on compensation, there are two different clauses there, one before the semicolon and one after. And the one before the semicolon discusses employment termination, either by the company or by him, which means resignation. The only other discussion in this section of employment termination by the company is 4A, termination of employment for cause. The second part of Section 4D after the semicolon deals with termination of the whole agreement in the event of death or disability. The only time that that's referenced in 4 is 4B, the agreement terminates for death or disability, which happens to accord with his testimony of his deposition that he would get paid or his family would get paid, his estate would get paid, in the event of his demise, his death. There's, we submit, no way you can reasonably read this provision two different ways. There is no ambiguity. Even if there were an ambiguity, contraproferendum is not the first place you go, it's the last place you go if you ever get there. Here we've got extrinsic evidence. We believe it's one-sided. We believe we prevail. If this court disagrees, there should be a jury trial on the issue of what the meaning of that provision is. But contraproferendum doesn't apply. It applies in the case of insurance contracts, form contracts, contracts of adhesion, and contracts where you have no negotiation or bargaining power. And none of those situations is involved here. Here we have a negotiated contract and we have extrinsic evidence. So there's no place for contraproferendum. The other part of the decision that goes beyond these parties, frankly, is the determination that you must have some kind of an inventory document or the contract fails. Here we've got two contracting parties, neither of whom wanted to have an inventory document attached or they would have, but they didn't. And in fact, it defies commercial practicalities here where the defendant himself testified that after counting the property once, all of the parts one time, that he had tears all over his inventory document, that he had carpal tunnel syndrome from counting all the nuts and washers and everything else. So he himself acknowledged the commercial practicality of doing yet another inventory. Then in his deposition admits that that document is included in the various sorts of property covered by the asset purchase agreement. So on the employment agreement, employment termination, we believe that we prevail. In the worst case, we ought to have a trial. And if this court disagrees with both of those options, in the absolute worst case, we ought to have a modification. And that is because of the serious felony conviction that was part of the judicial notice motion where Mr. Anthony has made himself unavailable for the final year of his contracting term. And in any event, would never have been able to fulfill his obligation. So the absolute worst scenario, we ought to have a modification. Well, while I've gotten your attention, as is sometimes the case when you go back and read your papers much later, my addendum to the brief table of contents is slightly misleading. I don't want any of you or your law clerks to wonder why it is that way. So the addendum table of contents does not call out two different documents that are actually in the addendum. So I don't want anyone to think that we stuck them in there. They're there. Addendum page 26 and addendum page 30 are standalone documents. They're just not called out on the table of contents. And if you've got no further questions, your honors, I'll reserve the rest of the time for rebuttal. Very well, thank you. Thank you. Thank you. Ms. Shannon, is it? Good morning. Good morning. You may proceed. Thank you. I never did have a chance to properly acknowledge you, Mr. Smatra, and I apologize for that. Thank you for hearing us this morning. It's nowhere near as interesting as a private suitcase, I think. Get into the mic, yeah. Speak a little louder? Yes, if you want. That's in case you wanted to have me hear it. Let's just suppose for a minute that the law permitted what Prince George is in this case. I could, for example, go into the grocery store. I could fill my cart with the items that I want to buy. I could go through the checkout line, check out all of the items, bag them, take them all with me, and then tell the clerk, I'm sorry, I'm only going to pay you for two of my 30 items that I just packed because you didn't provide friendly service, you didn't smile when you did it, and so I think there's just cause for me to not pay for the goods that I agreed to pay for, for the sale price. The bottom line is that the UCC governs this sales arrangement. It is a simple commercial dispute between two parties over an asset purchase. The agreement was that they would buy all of the inventory that was in the seller's possession and my client's possession at the time of the sale. Everybody knew it was nearly a year after the original inventory was provided and that the property that was in question at the time of the asset purchase agreement had changed over the course of that year. Business had gone on as usual. Everyone agrees in this case that the original inventory is obsolete. You find all to be unambiguous. I find all to be the antithesis of ambiguous. So you would come to my party at 5 o'clock? I would be there with bells on. I would take that drink, whether you paid in cash or with a credit card, Your Honor. The bottom line is that the UCC simply doesn't allow a just cause exception to payment for goods received. Now, the Quinstar in this case, the appellant has made some excuses about why they think they should not have to pay the price that they agreed to pay. The full price was $1,050,000. They paid $250,000 of that and have refused to remit the remainder. They took all, and I mean all, of the inventory that was there that is currently in Quinstar's possession. They have several excuses for that. One is just cause, which isn't going to apply here when the predominant purpose, and everyone agrees to this, was that the full transaction was a simple sale of goods and that the purpose of the employment contract was only as a vehicle to, quote, pay for the parts, and that is Quinstar's representative's testimony. In terms of other excuses, they are claiming, first of all, that they did not receive everything that they thought they were going to receive, that there was a shortfall. The sole piece of evidence that they are relying on here is a spreadsheet, which was created specifically for this litigation several years after the original inventory was created, two and a half years later, to be exact, and that spreadsheet is based on two inherently unreliable sources of information. The first is the inventory, which was created, again, nearly a year prior to the actual asset purchase agreement. Everyone says that that was obsolete at the time the agreement went through. And the second source of inventory is Quinstar's internal database. Now, Quinstar isn't in the business of selling merchandise. They're not like Target, where they keep an intensive track of all of the merchandise coming in and going out. They're not tracking that sort of thing. They're in a service industry where they are fixing banking equipment. And so the inventory that they purchased were nuts and bolts, widgets of various kinds, things that they used to perform those maintenance services. So they're not keeping good track of the inventory. They acknowledge that they're not doing regular audits, physical audits. They acknowledge that it was nearly two years after the original inventory before they finally went to Oklahoma to look at the goods that they purchased. And they are unable to identify specifically what it is that they purchased or that any one single item that they bought was not received. I asked several different opponents. One example of that is Mr. Didoan's testimony on page 167 of your appendix. And no one was able to identify a single item, one item, that they know that they purchased that they did not receive. The only evidence that they have is the spreadsheet, which is based on a database dump from their internal database of what their inventory says. We've put several documents in the record that demonstrate that that spreadsheet doesn't reflect inventory that in fact was shipped, was purchased, and that my clients did produce to them. So there's obvious, undisputed inconsistencies with the reality of what was received and what Quinnstar claims they actually received. Given that there are inherent indicia of untrustworthiness in that document, the fact that it was created for this litigation, there's no other spreadsheet like that that's kept in the ordinary course of business. And it's based on several layers of hearsay. None of those layers can be corroborated to the actual fact in this case. The spreadsheet itself, which is the only piece of evidence that Quinnstar relies on, is not admissible. The ultimate result is that Quinnstar acknowledges that they can't identify any item that they bought and did not receive. So the breach of contract claim fails. It fails not just on damages, but it fails on breach itself. They've got to actually be able to identify what they bought that wasn't delivered. The other element of this is that under the employment agreement itself, the court did get into an analysis of the issue of whether the employment agreement was ambiguous. I personally don't think you even need to get into that because the UCC controls, and there isn't a just cause exception under the UCC. The district court's interpretation disregarded the final words of Section 4D? The district court, and I'm happy to talk with you about that, it didn't disregard the final words of 4D. What it highlighted was that there is also another phrase under Section 4 that says that Mr. Anthony is going to be paid his salary if the agreement is terminated, quote, under Section 4, for any reason. And that is the problem, is that this phrase, for any reason, means to be disregarded, or other phrases in the contract are disregarded. The problem is that the contract itself is inherently inconsistent. Is it possible to say that it was a mere scrivener's error to omit that D section? I'm glad to raise that point. The Minnesota Supreme Court, and this isn't something that we got into much in our briefing, so I'm going to give you a case site. In Alpha Real Estate of Rochester, the case site is 664 Northwest 2E 303. The court analyzed the scrivener's error issue and said if the parties are in agreement on their intent, then the contract is read just in keeping with their statements. The other principle and rule of law is what we have briefed in this case, which is essentially if a contract is ambiguous, it's drafted against the drafter. The party's intent was consistent in their testimony. The parties testified, my client testified, and Mr. Didon testified at A179, that the party's agreement was to provide Kurt Anthony with, quote, a guaranteed payment for five years. There was no exception in his testimony for just cause. We talked about it at length in his deposition. He explained that he was confused when we were actually looking at the various drafts of the agreement and the correspondence going back and forth between the parties. There is one thing to note. If you do get heavily into the factual issues in this case, there were two owners of the company that were doing all of the negotiating with ProLogistics. Richard Didon was one of the owners that was primarily responsible for negotiating. Michael Ashley is the local Minnesota general manager who is the person that is claiming that there was a shortfall. He is a separate person than the people that were directly responsible for negotiating the agreement. So most of the testimony that is against my client is from the local manager who is actually not involved in these negotiations or in the discussions. It's very possible that it could have been a scrivener's error. It's also possible that when they drafted the contract itself, there's just an inherent ambiguity. And the problem is that my client understood and relied on all of the correspondence back and forth between the parties. Mr. Didon from Quinnstar acknowledges that the agreement was to give him a guaranteed payment for five years. Those statements about the parties' intents are consistent. They're not ambiguous in any way. And given the fact that if the contract language is ambiguous, it's construed against the drafter, we are in a situation where there isn't an issue for a jury to decide in terms of what the parties meant as to their contract language. With regard to the argument that the parties were of equal bargaining power, I respectfully beg to differ. My client is a sole proprietor. He did not have any employees. He was in a dying industry. He was the only other business that Quinnstar knew about who was actually in the business of selling the types of cards that he was selling. The business was definitely declining. And Quinnstar was the only primary buyer in the country at that time. So there was a huge disparity. Quinnstar was a well-established, extremely profitable organization. They had attorneys that were involved in drafting. And my client was an individual who was on his own. And in response to Mr. Sinatra's argument that at the very least there should be a modification of the award, you say no, of course. But why? In terms of a modification of the award, the employment agreement itself is subject to the UCC. So the agreed-upon purchase price was $1,050,000. They received all of the goods. They got to pay the price. There's evidence, clear evidence in the record that they did in fact receive everything, over $1,050,000 worth of goods. Mr. Didone again testified that he had sent an email acknowledging that they received over $1,000,000 worth of inventory. In addition to that, they received the formulas and the components for producing ink, which there's undisputed evidence in the record that that ran roughly $25,000 per month. So the U.S. Quinnstar relies a lot on Sellers v. Mineta. I think it's pronounced on this argument. I'm sorry, Sellers? The Quinnstar relies quite heavily on the Aspect Systems v. Lamb case, which I think that's the one that you're talking about, and I'm happy to discuss that. Maybe it's misread it, but the Sellers case I think involved an equitable remedy of front pay. This case involves what, legal damages? Does it make any difference? It makes a difference, yes, because this is just a UCC sale of goods transaction. So this isn't a situation where my client was being paid for his ongoing services. There is an employment agreement, but the employment agreement was, according to Quinnstar and everyone in the case, it was strictly a vehicle to pay for the parts. So it was an ongoing sort of deposit type situation. In fact, under the employment agreement itself, there were several months that my client went without pay at all and still was expected to perform services and be working with Quinnstar. So it truly is strictly an asset purchase agreement with a component where they're going to be paying on an ongoing basis going forward. And as far as the motion to take judicial notice, you've responded to that, I guess, already in your pleadings. Sure. I mean, the motion to take judicial notice is, again, it's a simple attempt to bring in after acquired evidence that was never pleaded. It's an issue that they have known about for quite a while. And again, going back to my grocery store example, it would be akin to me saying, I'm not going to pay for that broccoli because you committed a crime at some point in your life. And back to that case you cited, what, 664 Northwest 3rd? Yes, that is the Minnesota Supreme Court that's addressing the standard for speakers. No, we didn't. But you said, as you're familiar with Rule 28J of the Rules of Appellate Procedure, send the clerk a letter with the citation with copy to opposing counsel. And although we don't like to get into letter briefs, opposing counsel can send a one-page letter saying why they don't think the case applies. Okay, thank you. That way we have it in our records because I'm not very good at writing things down. I'm sorry, I didn't mean to step on you there. A question on the employment agreement. In some places it talks about termination of the agreement. In another place I see it talks about if the employee's employment with the company is terminated. Are those interchangeable? Do those terms mean the same thing? Is the agreement terminated when and if the employee's employment is terminated? I do see that my time is up, but I'd like permission to answer your question, if I may. Of course, of course, I'm sorry. When the court asks, you answer. It is our position that there is a cognizable difference, that the inherent problem of the employment agreement is that it is extremely confusing, it doesn't make a whole lot of sense, and that the parties both testified that their agreement was to ensure guaranteed payments to my client. So what's the answer? They mean the same thing? They mean the same thing. So when the employment ends, the agreement is terminated? That is what the defendant is claiming, that there are two different situations that would apply. It looks to me like it does, because the provision where it talks about disability and death, obviously that would end the employment, and it's referring to terminating the contract. The entire section under Section 4 is entitled termination. So I understand that entire section to be referring to terminating the contract itself. Well, you do have to kind of work your way through this. But, for example, I note that there appear to be some obligations under the agreement that continue after employment ends, like the confidentiality obligations. So I was just curious whether it's your position that termination of the agreement means this, or that ending of employment means the same thing as termination of the agreement. For example, in 4D, they use both of those terms in that paragraph. It is our position that they mean the same thing. All right. That's what I wanted to clarify. Thank you. Thank you. Thank you again. Good morning. May it please the Court. You may proceed, sir. Judge Shepard, indeed the two provisions, termination of employment and termination of the agreement, are two different things. There's no other way you can read Section 4 as a whole and synthesize the provisions to come out with a conclusion as a matter of law. If the Court feels that it can't do that, it needs to be tried to a jury with the evidence. Well, question, now your position is that, okay, the district court said that the $800,000 is owing. Your position is what the agreement envisioned was that if employment ends, no further obligation for payment unless it ends because of disability or death. Correct. That that was what was envisioned. That's precisely what was envisioned. Now, this was my question. There was a previous draft that seemed to clearly or at least more clearly state an agreement in line with what you're saying today. There is, your Honor, there is a Version 2 of that agreement that does exactly what Mr. Anthony wants it to do. It wasn't agreed to, and that was fully briefed and argued and evidence in the record on the fact that it was Version 3. Well, I thought there was an earlier version that said if employment is terminated, the company will have no further liability under the agreement, provided that if the agreement is terminated as a result of death or disability of the employee, the company will continue to pay the base salary for the balance of the five-year term. I don't have that. Isn't that what you say the agreement is? There is another version, a Version 2, in the record that was never signed, and that the Section 4B actually is favorable to the defendant, but that provision, a negotiated provision that he didn't get into the contract, didn't make it into the contract, and isn't part of the contract. This was a negotiated contract. He came to Quinnstar and asked to be an employee. We didn't want to employ him. Eventually, we agreed. So there's a significant question. He asked for something, and he got it. He asked for something else in 4D. He didn't get it. This was a negotiated agreement. We're not talking about just cause as if it's some kind of an equitable remedy, by the way. Cause is a defined term in the contract. The UCC itself says it may be trumped by agreement. Section 336.1-302 says you can vary the UCC by agreement. That's what happened. You've got a contract. You read both of these documents together, and there's a cause provision that says we can stop paying him. And, by the way, his reading, his proposed reading, and the reading proffered below at the district court, would allow him to be paid through the full term of the agreement even if he resigns. And that's respectfully an absurd result under the law. It can't be followed. Again, if we're looking at these two agreements together, as defendants want us to, and I don't think we can look at them separately, the asset purchase agreement pretty clearly says you can't apply contra-preferenti in any of them. So that provision ought to apply here. What criticisms we've heard, we've discussed in the papers as well, on the Mike Ashley spreadsheet, at most, that's nibbling around the edges. It doesn't affect anything other than damages. And we give him full credit for all of his post-inventory sales to Wells Fargo. Only $270,000 there. When asked at his deposition, Mr. Anthony, and this is cited in the briefs, Mr. Anthony said that he had no idea and he'd have to speculate what he shipped to Quinnstown. Finally, the million-dollar value concept, that we got a million dollars in value so everything's good, takes away the benefit of the bargain to the parties. It's not what the contract says. The contract says we get all these parts, all inventory, all equipment, all of the big modules and units, ink, fluid, all these things. His shortfall is on inventory. And, in fact, this is controverted once before the oral argument, and Mr. Ashley himself said the million dollars in value that they got wasn't true, that was inaccurate. At the time, he said that they received $300,000 in value, and that's at the Ashley deposition, 168 to 169. I don't have the addendum site, but I have the Ashley deposition site. It's in the appendix. Thank you very much. All right, well, the case is submitted. We thank both sides for the argument, and we will take the case.